UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CHETANKUMAR PRAVIN PATEL**,

Petitioner,

v.

**STUART HUDSON**,

Respondent.

Case No. 5:10 CV 2313

Judge Sara Lioi

REPORT AND RECOMMENDATION

Magistrate Judge James R. Knepp, II

## INTRODUCTION

Petitioner Chetankumar Pravin Patel, a prisoner in state custody, filed a Petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent, Stuart Hudson, filed a Return of Writ. (Doc. 6, 7). Petitioner then filed a Traverse. (Doc. 10). The district court has jurisdiction over the Petition under 28 U.S.C. § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated June 27, 2011). For the reasons discussed below, the undersigned recommends the Petition be denied and dismissed.

## BACKGROUND

### *Factual Background*

For purposes of habeas corpus review of state court decisions, findings of facts made by a state court are presumed to be correct and can only be contravened if the habeas petitioner can show, by clear and convincing evidence, that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies even to factual findings made by a state court of appeals based on the state trial record. *Id.*

Petitioner has not presented clear and convincing evidence in his Petition to contravene the facts

thoroughly recited by the Ninth District Court of Appeals:

[¶ 2]    At approximately 5:30 p.m. on July 1, 2005, Chetan[1] went to the Twinsburg police station and reported his wife, Sejal, missing. Chetan told officers that he hoped no one had "kidnapped and murdered" Sejal. According to Chetan and his family, Sejal had left for work earlier that morning in the family's Mercedes Benz, but never arrived. The family allegedly became concerned when Sejal failed to answer her cell phone and other extended family members indicated that they had not heard from her.

[¶ 3]    On the morning of July 2, 2005, Chetan telephoned the Twinsburg Police Department and notified officers that he had located the black Benz that Sejal had taken to work. Officer Brian Donato drove to the Chrysler Stamping Plant parking lot and found Chetan waiting in his Nissan Pathfinder next to the Benz. Officer Donato inspected the Benz from its exterior, but the sun glare largely prevented him from seeing through the vehicle's tinted windows. When Officer Donato cupped his hands and peered through the Benz' rear cargo side passengers' window, however, he saw what appeared to be a rolled up blanket. He asked Chetan if he knew what the object might be. Chetan responded in the negative, but then became alarmed and exclaimed, "that's my wife!" Once other officers arrived, they opened the Benz' hatch and discovered Sejal's body wrapped in a blanket. . . .

[¶ 37]   Twinsburg Police Department Officer Greg Feketik testified that he came to Chetan's home on both April 1, 2002 and May 1, 2005 based on reports of a domestic dispute. As to the first incident, Officer Feketik did not arrest Chetan because Sejal refused to press charges and had no visible injuries in spite of allegations that Chetan had slapped her. As to the second incident, Officer Feketik confirmed that he arrested Chetan after Tarun, Chetan's cousin, informed him that Chetan had struck Sejal and had gotten into an altercation with Tarun as a result. Officer Feketik clarified on cross-examination that the arrest led to a conviction, but only for disorderly conduct arising out of Chetan's fight with Tarun.

[¶ 38]   Officer Terry Wain also testified that he reported to Chetan's home on May 1, 2005. Officer Wain witnessed Chetan physically fighting with Tarun when he arrived on the scene, but the two stopped before he approached them. When Officer Wain interviewed Chetan about his involvement, however, Chetan denied having had any physical altercation with Tarun. Chetan also denied that Sejal had been involved

---

1. Because of the number of individuals named Patel involved in this case, the court used accepted abbreviations of their first names to identify them. "Chetan", short for Chetankumar, is the Petitioner in this case.

2

in the fight. Tarun directly contradicted these assertions during his testimony. Tarun admitted that he and Chetan had gotten into a fight on May 1, 2005 because he witnessed Chetan hit Sejal in the back of her head. Tarun testified that Chetan frequently hit Sejal for no reason.

[¶ 39]   Twinsburg Police Department Officer Darrin Fate testified that Chetan came to the police station at approximately 5:32 p.m. on July 1, 2005 to report Sejal missing. Chetan told Officer Fate that Sejal had left for work earlier that same morning in his black Benz, but never showed up. In his written statement, Chetan reported to Officer Fate that his mother, Minaxi, had been at home when Sejal left for work. When Chetan telephoned Minaxi in search of Sejal, she told him that Sejal had left sometime around 10:00 a.m. and had taken lunch for everyone at work. Chetan also called "everybody" that he and Sejal knew in an attempt to locate her. Officer Fate indicated that Chetan appeared to be very upset while speaking with him and yelled that he hoped that no one had "kidnapped and murdered his wife." At this point, Sejal had been gone for approximately seven and a half hours.

[¶ 40]   Officers James Tobak and Brian Donato both testified that they reported to the Chrysler Stamping Plant parking lot the afternoon of July 2, 2005 after receiving word that Chetan had found the Benz that Sejal allegedly had driven to work the previous day. Officer Donato testified that after reviewing the surveillance tapes from the parking lot, he estimated that the Benz had been placed in the parking lot at approximately 10:18 a.m. on the morning of July 1, 2005.

[¶ 41]   Lata Patel, Sejal's mother, testified that Chetan married her daughter through an arranged marriage, but that she never approved of the marriage. Lata's husband, Sejal's father, loaned Chetan approximately $126,000 when the two married and another $100,000 later on in the marriage so that Chetan could purchase a business. Lata testified that once before her murder Sejal disappeared from home without telling Chetan where she was going. Chetan did not call Lata to ask her if Sejal might be with her until two days after her disappearance. When Sejal "disappeared" on the day of her murder, however, Chetan called Lata about two to three times the same day to ask if she had heard from Sejal. Lata testified that she and Sejal had made plans for Sejal and her two children to visit Lata that same weekend and stay for several days. Yet, Sejal never arrived, and Lata soon learned that her daughter had been murdered. At the time of Sejal's death, Lata estimated that Chetan still owed her and her husband approximately $88,000 on the loan that they had given him to buy his business.

[¶ 42]   Twinsburg Police Officer Brian Donato testified that dispatch sent him to the Chrysler Stamping Plant parking lot on the morning of July 2, 2005 after Chetan informed officers that he had found the Benz that Sejal allegedly left for work in the previous morning. When Officer Donato arrived he saw the Benz parked in the corner of the lot against a wall and Chetan's Pathfinder parked alongside the Benz

3

with Chetan still in the driver's seat. Chetan indicated that he had not approached the Benz while waiting for Officer Donato to arrive. He stated that he had gone to Fun n' Stuff in another attempt to locate Sejal because she had made plans to take the kids there that day. He further stated that he happened to see and recognize the Benz in the Chrysler parking lot on his drive back home. Chetan made no mention of how Sejal planned to visit her mother (who lived in Chicago) the same day that she was allegedly planning to take the children to Fun n' Stuff.

[¶ 43]  Officer Donato testified that Chetan had stepped out of his vehicle and the two approached the Benz. Officer Donato looked through the vehicle's front window and opened the driver's side door after failing to see anyone in the vehicle. Still failing to see anything, Officer Donato walked to the back of the Benz and peered through the rear windows. The sun glared against the windows, however, and made it difficult to see inside. Officer Donato then cupped his hands and placed them against the rear cargo side window. He saw what appeared to be a "rolled up blanket or carpet," so he asked Chetan if he knew what the object was. Chetan initially did not, but then yelled "[t]hat's my wife!" Chetan then became hysterical and Officer Donato did his best to restrain him until another officer arrived.

[¶ 44]  Officer James Tobek arrived on the scene shortly after 12:30 p.m. He too had difficulty seeing inside the Benz' windows because of the sun glare, but he decided to open the Benz' rear hatch once he cupped his hands near the glass and saw a "rolled object" in the vehicle. Officer Tobek discovered Sejal's body, wrapped in a blanket, inside of the vehicle. The police estimated from surveillance tapes in the Chrysler Stamping Plant parking lot that the Benz had been placed in the lot at about 10:18 a.m. on July 1, 2005.

[¶ 45]  Dr. George Sterbenz, the Chief Deputy Medical Examiner for Summit County, testified that he examined Sejal's body and performed her autopsy. Dr. Sterbenz noted that Sejal was fully clothed when the police found her, but did not have on any shoes or socks. He further noted that Sejal had bruising on her left leg, marks on her neck, several blunt force injuries to her face and scalp, and petechia of the face. Dr. Sterbenz opined that Sejal died from a combination of manual and ligature strangulation over the course of several minutes. That is, she died from a stop in blood flow to the brain due to force being applied to her neck by someone's hands and by an object. Dr. Sterbenz found a green string or thread in one of the folds of Sejal's neck. Although he could not pinpoint Sejal's time of death because of the hot temperatures in the Benz where she was found, Dr. Sterbenz did note that he found money in Sejal's pockets when he removed her clothing and that she still had a necklace around her neck.

[¶ 46]  Apart from testifying about Chetan's prior incidents of domestic violence, Tarun Patel testified about the time that he spent living at Chetan's house. Tarun testified that Sejal had small quarrels with Chetan's mother, Minaxi, once she moved

4

into their home. Tarun attempted to downplay the amount of fighting that Chetan and Sejal engaged in during their marriage, stating that they only had the typical, small fights that most married people had. Tarun admitted, however, that he told officers that Chetan "would hit [Sejal] for no reason and boss her around[.]" Tarun also acknowledged a prior occasion when Sejal had left for about two days without telling Chetan of her whereabouts. Tarun stated that he was not aware of Chetan having called the police to search for Sejal on this prior occasion. He also stated that, at the time of Sejal's disappearance, Chetan and Rupal had been having an affair and Chetan owed Tarun approximately $50,000.

[¶ 47]  Chirag Patel, a friend of Chetan's family and a co-owner of Chetan's restaurants, testified that he arrived at work on July 1, 2005 at approximately 10:20 a.m. He stated that Chetan was already there when he arrived, but that Sejal never showed up. Chetan left the store sometime in the afternoon to speak with the police and to look for Sejal, but returned around 9:30 p.m. Chirag stated that Chetan was drunk when he returned to the store. Chetan appeared to be very upset and wanted to know if he would have to go back to India and get married again. Once they were ready to leave the store, Chirag follow Chetan's car back to Chetan's house. Chirag testified that on the way home, Chetan stopped at the intersection of Route 82 and Chamberlin Road, one corner of which is occupied by the Chrysler Stamping Plant parking lot. Chirag stated that Chetan's vehicle remained stopped at the intersection for a full minute before Chetan resumed driving again. When Chirag arrived at Chetan's house he entered through the garage. As he passed through the garage, Chirag saw that both pairs of Sejal's shoes were still in the garage.

[¶ 48]  Chirag also testified that he spoke with Chetan on the day that Chetan discovered Rupal had been arrested regarding Sejal's death. Chirag knew that Chetan and Rupal had been having an affair, so he asked Chetan about Rupal's arrest. Chetan then began to cry. When Chirag asked Chetan why he was crying, he said that "Rupal is going to say something to police about me. I'm done if Rupal says something. The police are not going to listen to me."

[¶ 49]  Vijay testified against Chetan after pleading guilty to the aggravated murder of Sejal. Vijay testified that he had engaged in an affair with Minaxi, Chetan's mother, while the two still lived in India. After Minaxi moved to the United States and began to live with Chetan and new daughter-in-law, she frequently spoke poorly of Sejal and told Vijay that she wanted to kill Sejal. Chetan also expressed a desire to kill Sejal. According to Vijay, Minaxi and Chetan attempted to have Sejal killed on three occasions before July 1, 2005. He indicated that Minaxi arranged to have his debts paid off upon his coming to the United States on the condition that he do whatever she asked.

[¶ 50]  Vijay testified that the following series of events took place regarding Sejal's murder. On the night of June 30, 2005, Minaxi called Vijay and Rupal, his roommate

and Chetan's love, at their residence and told them to be over [at] Chetan's house in the morning. When the two arrived the next morning, Minaxi came out to the car and brought Vijay inside while indicating that Rupal should leave and return with the car in about half an hour. Vijay entered the house with Minaxi, and she gave him gloves to wear. Although Vijay told Minaxi that he did not wish to be involved, Minaxi threatened Vijay and his family, telling him that it would be easy to have him deported or killed or to pay someone in India to kill his family. Consequently, Vijay reluctantly went along with the murder.

[¶ 51]  As Vijay entered the room where Sejal was, he observed Chetan sitting on the sofa with Sejal's head on his lap. Chetan had a rope around Sejal's neck and was using it to strangle her. Chetan's father, Pravin Patel, held down Sejal's legs on the opposite end of the couch. Minaxi repeatedly struck Sejal in the leg while she was being strangled. Chetan also made Vijay hold onto the rope and help to strange Sejal. During her murder, Sejal wore an old, faded blue t-shirt and black leggings. Once the murder was accomplished, Minaxi and Chetan changed Sejal into her work uniform, and the family carried her body out to the Benz. Minaxi gave Vijay $10,000 in cash and told him that he and Rupal had to drive Sejal's body to the Chrysler Stamping Plant parking lot. By then, Rupal had returned, and the family permitted her to take Vijay for some coffee before coming back to dispose of Sejal's body.

[¶ 52] Once in the car, Rupal and Vijay traveled to the local Speedway gas station. Vijay told Rupal that he had helped to kill Sejal, and the two discussed fleeing the area. Both Vijay and Rupal attempted to call Chetan's home and tell him and Minaxi that they were not coming back, but they could not establish a connection from the gas station phone. The two returned to Chetan's house. Once again, Minaxi threatened them and their families, so they agreed to go forward with the plan. Minaxi handed Vijay a bag containing the clothing Sejal had on during the murder, her cell phone, the rope used to strangle her, and the gloves that the family had worn to murder her. Minaxi told Vijay that she had "cleaned the house . . . [and] gathered up all the clothes . . ., so there's no chances of us getting arrested. . . . [T]hey will feel that she was going to the store and somebody must have killed her on the way there and they must have left her there." She then instructed Vijay to go somewhere else after disposing of the body and to discard the items. Rupal drove the Benz to the Chrysler parking lot while Vijay followed behind her. After leaving the body, Rupal and Vijay drove away. During the drive, Vijay threw separate pieces of evidence Minaxi gave him along the side of the road.

[¶ 53]  During her testimony, Rupal testified to the following series of events regarding Sejal's murder. Rupal and Chetan had a relationship in India before moving to the United States and continued to have a sexual relationship in the United States after he married Sejal. Both Chetan and Minaxi frequently complained about Sejal, who had married Chetan through an arranged marriage. Subsequently, both Chetan and Minaxi expressed a desire to kill Sejal, and Chetan told Rupal that she

6

must come to his house on the morning of July 1, 2005 to carry out Sejal's murder. Rupal expressed the same version of events as Vijay with the exception of the details of Sejal's actual murder, which took place after Rupal dropped Vijay at the house and before she returned. Rupal indicated that Minaxi became nervous after Rupal and Vijay finished dropping Sejal's body off at the Chrysler parking lot because they had forgotten to put Sejal's lunch in the car with her and to put her socks and shoes on her feet. . . .

[¶ 56]  Additionally, other evidence in the record supported Vijay's and Rupal's testimony. Detective Scarl testified that the evidence supported the theory that Sejal's family, not a stranger, was responsible for the murder. The evidence comports with this theory because police found money in Sejal's pockets and a necklace on her neck, suggesting that she was not the victim of a robbery or theft crime. Further, the police estimated that the Benz containing Sejal's body was placed at the Chrysler Stamping Plant parking lot by approximately 10:18 a.m. on the morning of July 1[,] only half an hour after Minaxi claimed that Sejal had left home for work. When the police found Sejal's body, she did not have any socks or shoes on her feet. Both pairs of her shoes had been left in the garage at home. Tarun testified that typical Indian custom forbids the wearing of shoes inside of the home, thereby suggesting that Sejal was killed in her traditional Indian home before she put on her shoes to leave for work. Sejal had bruising on her legs and ligature marks on her neck[.] These injuries comport with Vijay's testimony that Minaxi beat Sejal's legs while Chetan strangled her with a rope. Finally, by his own statement, Chetan expressed concern that Rupal would turn him over to the police for his involvement and that, if she did so, he would be "done" because the police would not listen to him.

*State v. Patel*, 2008 Ohio 4693, ¶¶ 2–3, 37–53, 56 (Ohio Ct. App. 2008).

### State Court Proceedings

In May 2007, Petitioner was indicted by the grand jury on one count each of aggravated murder, tampering with evidence, and abuse of a corpse, in violation of Ohio Revised Code §§ 2903.01, 2921.12(A)(1), and 2927.01, respectively. (Doc. 6-1, at 1–2). He plead not guilty to each charge. (Doc. 6-3, at 3). Following a jury trial in the Summit County Court of Common Pleas, Petitioner was convicted on all three charges on November 20, 2007. (Doc. 6-1, at 28). The trial court thereafter sentenced him to 30 years to life imprisonment for the aggravated murder conviction, three years imprisonment for the tampering with evidence conviction, and one year

imprisonment for the abuse of a corpse conviction, all to run concurrently. (Doc. 6-1, at 30–31).

Petitioner timely appealed to the Ninth District Court of Appeals. (Doc. 6-1, at 34). In his appellate brief, Petitioner asserted six assignments of error:

> Assignment of Error Number One
> The court committed error, prejudicial to Defendant-Appellant, by permitting the state to introduce the testimony of an attorney that Rupal Patel, a testifying co-defendant, had given a prior consistent statement.
>
> Assignment of Error Number Two
> It was error for the court to permit the testimony of a prior consistent statement under Evid. R. 801(D)(1)(b), when the prior statement is not consistent with the trial testimony.
>
> Assignment of Error Number Three
> Defendant-Appellant was denied his constitutionally protected right to effective assistance of counsel under *Strickland v. Washington* (1984), 466 U.S. 688.
>
> Assignment of Error Number Four
> It was error for the court to have failed to instruct the jury regarding the limited purposes for which other acts testimony was received.
>
> Assignment of Error Number Five
> The trial court committed error prejudicial to Appellant by the admission of other acts testimony.
>
> Assignment of Error Number Six
> The jury verdict is against the manifest weight of the evidence.

(Doc. 6-1, at 37–38).

While waiting for a decision on his direct appeal, Petitioner filed a petition for postconviction relief (PCR) with the trial court. (Doc. 6-1, at 126). He then moved the Court of Appeals to withhold entry of judgment until the trial court ruled on his PCR petition. (Doc. 6-1, at 124). In the PCR petition, Petitioner argued his Sixth Amendment right to effective assistance of counsel had been violated, pointing to several alleged errors apparent from the face of the trial record as well as three errors *de hors* the trial record. (Doc. 6-1, at 127, 131–134).

8

The state of Ohio opposed Petitioner's motion to withhold judgment by the Court of Appeals (Doc. 6-1, at 146), and on September 17, 2008, the Court of Appeals issued a decision affirming Petitioner's convictions (Doc. 6-1, at 148–172). The court then denied Petitioner's motion to withhold judgment as moot. (Doc. 6-1, at 173).

Petitioner timely appealed the Court of Appeals' decision to the Ohio Supreme Court. (Doc. 6-1, at 174). In his memorandum in support of jurisdiction, Petitioner raised five propositions of law:

Proposition of Law Number I:
The state may not bolster the credibility of a testifying co-defendant with the hearsay testimony of the witness's attorney that, during attorney/client discussions, the Witness/Client told the same story. The hearsay exception of Evid.R. 801(D)(1)(b) forbids such evidence unless the prior statements are themselves consistent and they were made before the emergence of a motive or influence to invent or falsify.

Proposition of Law Number II:
When other acts testimony is admitted over pretrial and trial objections, and counsel fails to request a limiting instruction, due process requires the Court to evaluate the failure in the context of plain error under Crim. R. 52(B).

Proposition of Law Number III:
Defendant was denied his constitutional rights to a fair trial by the [i]ntroduction of other acts testimony over his objection.

Proposition of Law Number IV:
Defendant was denied his constitutionally protected right to effective assistance of counsel under *Strickland v. Washington* (1984), 466 U.S. 688.

Proposition of Law Number V:
Defendant was denied his constitutional rights to due process of law because the jury verdict of guilty was against the manifest weight of the evidence.

(Doc. 6-1, at 177). The state of Ohio waived its right to file an opposition to Petitioner's memorandum in support of jurisdiction. (Doc. 6-1, at 217). On February 24, 2009, the Ohio Supreme Court declined jurisdiction to hear the case and dismissed the appeal "as not involving any substantial constitutional question." (Doc. 6-1, at 218).

9

Meanwhile, Petitioner's PCR petition was denied by the trial court through a bare-bones journal entry dated September 12, 2008. (Doc. 6-2, at 13). Subsequently, Petitioner moved the court for findings of fact and conclusions of law. (Doc. 6-2, at 41). The trial court then entered an order denying Petitioner's PCR petition but containing findings of fact and conclusions of law. (Doc. 6-2, at 43–49). Petitioner timely appealed this order denying his PCR petition to the Ninth District Court of Appeals. (Doc. 6-2, at 50). In his appellate brief, Petitioner raised three assignments of error:

> Assignment of Error No. I:
> The trial court erred to the prejudice of Defendant-Appellant's Sixth Amendment right by not finding counsel ineffective for interfering with his understanding and right to testify and abused its discretion by failing to hold an evidentiary hearing.
>
> Assignment of Error No. II:
> Defendant-Appellant was denied his Sixth Amendment right to effective assistance of counsel and to have compulsory process for obtaining witnesses in his favor when trial counsel failed to investigate and interview two potential witnesses favorable to his defense and the trial court abused its discretion in failing to hold an evidentiary hearing.
>
> Assignment of Error No. III:
> The trial court abused its discretion by failing to hold an evidentiary hearing and erred to the prejudice of Defendant-Appellant when the court made a blanket assessment regarding the credibility of two potential witnesses for the defense.

(Doc. 6-2, at 58). On June 30, 2009, the Court of Appeals issued a decision affirming the trial court's denial of Petitioner's PCR petition. (Doc. 6-2, at 115–122).

Petitioner timely appealed to the Ohio Supreme Court. (Doc. 6-2, at 123). In support of jurisdiction this time, he raised three propositions of law:

> First Proposition of Law
> When [sic] the [t]rial [c]ourt errs and abuses it[s] discretion by failing to hold an evidentiary hearing when the Defendant-Appellant demonstrated that [h]is [t]rial [c]ounsel was ineffective to [h]is [p]rejudice when [c]ounsel interfered with [h]is understanding of [h]is rights to testify violating the Defendant-Appellant's Fifth, Sixth[,] and Fourteenth Amendment rights under the U.S. Constitution.

10

<u>Second Proposition of Law</u>
When a Defendant-Appellant is denied [h]is [S]ixth Amendment right to effective [a]ssistance of [c]ounsel, and compulsory process, the [t]rial [c]ourt errs and abuses it[s] discretion when it fails to grant the Appellant's Petition for Post Conviction relief, and/or hold an evidentiary hearing so the Appellant may further develop[] the claims contained therein.

<u>Third Proposition of Law</u>
When [sic] the [t]rial [c]ourt errs and abuses it[s] discretion by failing to hold an evidentiary hearing and not granting the Defendant-Appellant's Petition for Post Conviction Relief when the Appellant demonstrated that two potential witnesses would have testif[i]ed that the State's co-defendant was commit[t]ing perjury and [t]rial [c]ounsel was ineffective for failing to interview or investigate these witnesses. Violating the Defendant-Appellant's Due Process rights and Sixth Amendment right to [e]ffective [a]ssistance of [c]ounsel the [c]onviction must be set aside.

(Doc. 6-2, at 129–140). Once again, the state of Ohio waived its right to file an opposition (Doc. 6-2, at 150), and the Ohio Supreme Court denied leave to appeal "as not involving any substantial constitutional question" (Doc. 6-2, at 151).

Not to be deterred, Petitioner then filed a motion with the trial court to be sentenced, arguing that his previous sentence was void and not a final, appealable order because the court failed to comply with Ohio Criminal Rule 32(C). (Doc. 6-2, at 152). But Petitioner also argued the trial court's journal entry contained unconstitutional findings of fact. (Doc. 6-2, at 153–154). The trial court denied Petitioner's motion without explanation on March 16, 2010. As could be expected, Petitioner timely appealed this denial to the Ninth District Court of Appeals. (Doc. 6-2, at 163). He asserted one assignment of error: "The trial court erred when it denied Mr. Chetankumar [sic] Motion to enter a final appealable order." (Doc. 6-2, at 168). The Court of Appeals, in what marked Petitioner's third appearance before that court, affirmed on September 22, 2010. (Doc. 6-2, at 192). Surprisingly, there is no evidence in the record of Petitioner appealing this ruling to the Ohio Supreme Court. Thus endeth Petitioner's three-year sojourn in the state court system.

11

*Federal Habeas Corpus*

Petitioner filed the instant Petition on October 10, 2010. (Doc. 1). He argues three grounds

for relief:

**First Claim for Relief (Admission of Unfairly Prejudicial Evidence)**

The trial court erred in admitting into evidence irrelevant and improper evidence prejudicial to the defendant/appellant in the form of the admission of testimony of prior violent acts against his wife. No charges grew out of the alleged incident. The admission of the disputed evidence in violation [sic] of the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution.

**Second Claim for Relief (Denial of Right to Testify)**

. . . Petitioner Patel did not voluntarily, intelligent and knowledgeably [sic] waive his right to testify. Patel was not fully advised by counsel or the court about his absolute right to testify. The actions of trial counsel intimidated Patel into not testifying. The trial court failed to conduct a colloquy with Patel to ensure that he understood his right.

**Third Claim for Relief (Ineffective Assistance of Counsel)**

. . . Petitioner Chetan Patel's trial counsel rendered ineffective assistance at his trial so as to violate his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

(Doc. 1-1, at 9–17).

JURISDICTIONAL ISSUES

*Procedural Default*

Reasons of federalism and comity generally bar federal habeas corpus review of "contentions

of federal law . . . not resolved on the merits in the state proceeding due to [the] failure to raise them

there as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

When a petitioner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that

12

failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Procedural default occurs when a petitioner fails to present fairly to the highest state court his claims in a federal constitutional context. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Anderson v. Harless*, 459 U.S. 4 (1982). Moreover, a failure to present a claim to the highest court in the state deprives a federal court hearing a habeas petition of jurisdiction on that issue. *See McKeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

One way procedural default occurs is when the last state court rendering a decision makes a "plain statement" basing its judgment on a procedural bar. *Harris v. Reed*, 489 U.S. 255, 265 (1989). That is, if, due to the petitioner's failure to comply with a procedural rule, the state court declines to reach the merits of an issue, and the state procedural rule provides adequate and independent grounds for precluding relief, then the issue is procedurally defaulted unless there was actual prejudice by the alleged constitutional error and "cause" for not following the procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). But "[t]he mere existence of a basis for a state procedural bar does not deprive [federal courts] of jurisdiction; the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." *Bowling v. Parker*, 344 F.3d 487, 498 (6th Cir. 2003) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985)); *see also Coleman*, 501 U.S. at 735 (holding the last state court rendering a reasoned judgment must "clearly and expressly" state its judgment rests on a procedural bar for procedural default to apply).

If the state argues a petitioner has procedurally defaulted his claims, the court must conduct a four-step analysis to determine whether the petitioner has indeed defaulted and, if so, whether the procedural default may be excused:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. . . . This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims. . . . [Fourth, if] the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin*, 785 F.2d at 138.

A procedural default will be excused if the petitioner demonstrates that not excusing the default "will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. This is a power derived from the court's equitable discretion. *McCleskey v. Zant*, 499 U.S. 467, 490 (1991). Despite statutory revision removing reference to an "ends of justice" inquiry by federal habeas courts, the Supreme Court has held that such an inquiry remains appropriate, but requires that a petitioner "supplement[] a constitutional claim with a 'colorable showing of factual innocence.'" *Id.* at 495 (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986)). Maintaining this exception to the rule against reviewing procedurally defaulted claims serves as "an additional safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty". *Id.* (quoting *Stone v. Powell*, 428 U.S.  465, 492–493 (1976)).

Here, Respondent argues Petitioner defaulted his argument that trial counsel was ineffective for failing to object to Detective Scarl's testimony, because the Court of Appeals cited a procedural rule he failed to comply with and dismissed the argument. (Doc. 6, at 30). The Court of Appeals said:

Chetan  argues  that  his  counsel  failed  to  object  when  Detective  James  Scarl

14

> inappropriately indicated that Chetan had requested an attorney before speaking to
> police any further. He further argues that his counsel should have objected when
> Detective Scarl "relate[d] his theories and beliefs about how and why the murder
> occurred." Yet, Chetan fails to point this Court to his responses. An appellant bears
> the burden of demonstrating error on appeal through citations to the record. See
> App.R. 16(A)(7). Because we have no way of knowing the questions or responses
> with which Chetan takes issue, we cannot determine whether Chetan's counsel failed
> to object to the same and/or whether an objection was necessary. As such, this
> argument lacks merit."

*State v. Patel*, 2008 Ohio 4693, at ¶ 26 (Ohio Ct. App. 2008). The Court believes this was not a clear

failure to consider the claim on the merits. Rather, the Court of Appeals appears to have looked for

merit and found none, hence the determination that Petitioner's argument "lacks" merit. If, in fact,

the court had refused to hear the merits of the argument, no such determination would have been

made. The Court construes this language to mean the Court of Appeals considered Petitioner's

argument on the merits but was unable to find evidence in the transcript to support his claims. As

such, the second step of the *Maupin* test is not met because the court did not actually enforce the

procedural sanction of refusing to hear the merits. As such, ground three is not procedurally

defaulted.

**Fair Presentation**

Respondent argues Petitioner failed to fairly present his first ground to the state courts as a

federal claim. (Doc. 6, at 26). To obtain habeas relief, a petitioner must first exhaust all available

state court remedies. 28 U.S.C. § 2254(b)(1). This requirement is satisfied only if the petitioner's

claim is "fairly presented" to the state courts before seeking relief in the federal courts. *Baldwin v.

Reese*, 541 U.S. 27, 29 (2004); *Whiting v. Burt*, 395 F.3d 602, 612 (6th Cir. 2005). In explaining this

requirement, the Supreme Court has said:

> [W]e made clear that 28 U.S.C. § 2254 requires a federal habeas petitioner to provide
> the state courts with a "fair opportunity" to apply controlling legal principles to the

facts bearing upon his constitutional claim. It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made. In addition, the habeas petitioner must have "fairly presented" to the state courts the "substance" of his federal habeas corpus claim.

*Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citations omitted). This fair presentation requirement has been strictly followed by the Sixth Circuit, to the point where a catch-all allegation such as claiming the defendant was denied his constitutional right to a fair trial, when supported only by state law, does not fairly apprise the state court of the appellant's specific constitutional theory. *Weaver v. Foltz*, 888 F.2d 1097, 1099 (6th Cir. 1989). Similarly, the phrases "fair trial" and "due process", by themselves, "do not call to mind a specific right protected by the Constitution." *Weaver*, 888 F.2d at 1099 (citing *Petrucelli v. Coombe*, 735 F.2d 684, 688 (6th Cir. 1984)).

A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement and be exhausted. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking *one complete round* of the State's established appellate review process." (emphasis added)). If a state defendant fails to fairly present a federal constitutional claim to the state courts, he waives the claim for purpose of federal habeas corpus review. *Weaver*, 888 F.2d at 1099.

Petitioner's first ground is based on the admission of "unfairly prejudicial" evidence against him. (Doc. 1-1, at 9–10). Specifically, he argues evidence of the two domestic violence incidents he was involved in – allegedly slapping his wife in April 2002 and getting into a physical altercation with Tarun in May 2005 – should not have been admitted because the first was three years prior to

16

the homicide and the second, Petitioner argues, did not involve Sejal.[2] In support of this argument,

Petitioner cites *Chambers v. Mississippi*, 410 U.S. 284 (1973), and various Sixth Circuit decisions

about egregious evidentiary rulings denying fundamental unfairness. This amounts to a Due Process

argument under the Fifth and Fourteenth Amendments.

On direct appeal to the Ninth District Court of Appeals, Petitioner raised the following

assignments of error related to this ground:

> Assignment of Error Number Four
> It was error for the court to have failed to instruct the jury regarding the limited
> purposes for which other acts testimony was received.

> Assignment of Error Number Five
> The trial court committed error prejudicial to Appellant by the admission of other
> acts testimony.

(Doc. 6-1, at 37–38). Petitioner made a similar argument to the Ohio Supreme Court: "Defendant

was denied his constitutional rights to a fair trial by the [i]ntroduction of other acts testimony over

his objection." (Doc. 6-1, at 177). But Respondent argues Petitioner's appellate brief relied

exclusively on state law in support of these related assignments of error.

In support of his argument on assignment of error number four, regarding the lack of limiting

instruction to the jury, Petitioner cited Ohio Evidence Rules and Ohio cases which speak about the

"courts of this state". (Doc. 6-1, at 54); *State v. Lewis*, 66 Ohio App.3d 37, 43 (Ohio Ct. App. 1990).

After reviewing his entire, one-page argument for this assignment of error, the Court concludes this

was not a federal constitutional argument. No federal law was cited, described, or even implied by

Petitioner; this was purely an argument about the Ohio Evidence Rules. Not  to mention, an

---

2. In actuality, the testimony about the second incident was that Petitioner and Tarun were fighting
because Petitioner had hit Sejal. *Patel*, 2008 Ohio 4693, at ¶ 37. So in essence, Sejal *was* involved
to some extent.

argument that the trial court should have given a limiting instruction on evidence admitted is not the same as an argument that the court should not have admitted the evidence in the first place. Therefore, assignment of error number four would probably not satisfy the fair presentation requirement even if it were phrased as a federal claim.

Similarly, in his argument to support assignment of error number five, Petitioner cited Ohio Evidence Rules and two Ohio cases: *State v. Strobel*, 51 Ohio App. 3d 31 (1988), and *State v. Cotton*, 113 Ohio App. 3d 125 (1996). (Doc. 6-1, at 55). No federal law was discussed or cited. There is no indication from his one-page argument that he was making a federal constitutional claim. In fact, the cases he cited were for propositions of law *other than* that the admission of such evidence denies a defendant his Due Process right to a fair trial. Instead, the courts in *Cotton* and *Strobel* were focused entirely on issues of state evidence law. In *Strobel*, the relevant issue was whether the trial court violated Ohio Evidence Rule 404(B) or Ohio Revised Code § 2945.59 by admitting prior acts testimony to show motive or intent. *Strobel*, 51 Ohio App. 3d at 36–38. Similarly, in *Cotton*, the court was concerned about prior acts testimony being used by a jury to improperly convict based on a propensity inference. *Cotton*, 113 Ohio App. 3d at 131. So not only did Petitioner not cite or refer to federal law, but the cases he cited for support did not either. This cannot pass exhaustion muster under 28 U.S.C. § 2254(b)(1)(A).

Moreover, the thrust of Petitioner's argument in assignment of error number five was that the admission of this evidence allowed in forbidden character evidence (as his citation to *Cotton* shows); he did not even mention the words "fair trial" – even though the words "fair trial" or even "due process", by themselves, are insufficient to put the court on notice of a federal claim. *Petrucelli v. Coombe*, 735 F.2d 684, 688 (6th Cir. 1984). The Court cannot find ground one of the instant

18

Petition fairly presented to the Ninth District Court of Appeals. Without fair presentation to that intermediate appellate court, a full round of state appellate review of the claim could not have taken place even if Petitioner fairly presented the claim to the Ohio Supreme Court. *See O'Sullivan*, 526 U.S. at 848. As a result, the Court must strictly adhere to the fair presentment requirement and refuse to address the merits of ground one. *See Weaver*, 888 F.2d at 1099.

## STANDARD OF REVIEW

When the basis for a federal habeas claim has been previously adjudicated by the state courts, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides the writ shall not issue unless the state decision "was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A legal doctrine is not "clearly established federal law as determined by the Supreme Court" unless it is based on "holdings, as opposed to the dicta, of the Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A federal court may grant habeas relief if the state court arrives at a decision opposite to that reached by the Supreme Court of the United States on a question of law, or if the state court decides a case differently than did the Supreme Court on a set of materially indistinguishable facts. *Id.* at 405. The appropriate measure of whether or not a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Id.* at 409–11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000).

To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there

19

was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).

**ANALYSIS**

First Ground for Relief

As discussed above, Petitioner's first ground for relief has not been exhausted because it was not fairly presented to the state courts as a federal constitutional issue. Accordingly, the Court cannot address it on the merits. *See Weaver*, 888 F.2d at 1099.

Second Ground for Relief

In Petitioner's second ground for relief, he claims the trial court failed to ensure that his right to testify at trial was validly waived. (Doc. 1, at 26–29). After review of Respondent's Return of Writ and conducting further research, Petitioner now concedes "that the Warden is correct on the merits in relation to this claim." (Doc. 10, at 9). The Court agrees. It is apparent from the record that Petitioner knew of his right to testify and chose not to. (Doc. 6-19, at 13–14). Therefore, the Court will not address this issue further.

Third Ground for Relief

Because the Court has determined Petitioner did not procedurally default his third ground for relief, there is jurisdiction to address it on the merits. Petitioner asserts his trial counsel was ineffective, thereby violating his Sixth and Fourteenth Amendment rights. Petitioner identifies a litany of specific ways in which he asserts his trial counsel's assistance was deficient and prejudicial. Paraphrasing, Petitioner argues:

(1)     Counsel failed to fully investigate in preparation for trial, and as a result, did not challenge the testimony provided by Vijay that he paid Meghna and Rasik, when such testimony was later sworn to be false;

20

(2)     Counsel permitted testimony, without objection or a request for curative instruction, that Petitioner practiced his right to pre-arrest silence and requested an attorney upon being questioned by the police;

(3)     Counsel permitted inadmissible hearsay and opinion testimony from Detective Scarl, without objection, to relate his theories and beliefs about how and why the murder occurred;

(4)     Counsel failed to object during the prosecution's closing argument when Petitioner was referred to as a "wife abuser" and "adulterer", was said to have married Sejal for money from her family, and was involved in "domestic violence"; and

(5)     Counsel failed to request jury instructions about the limited purpose for which the court admitted evidence of prior domestic violence incidents, and about the jury's right to consider the absence of motive as a circumstance that may be considered in weighing the evidence of guilt.

(Doc. 1-1, at 15–17).

To prevail on an ineffective assistance of counsel claim, a petitioner must satisfy both prongs of the *Strickland* test: performance and prejudice. *Harries v. Bell*, 417 F.3d 631, 636 (6th Cir. 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 686-692 (1984)). To meet the performance prong, counsel's representation must fall below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688. To meet the prejudice prong, there must be a reasonable probability that, absent counsel's unprofessional errors, the results of the proceeding would have been different. *Id.* at 694. When considering the prejudice element, the focus is on whether counsel's errors undermined the reliability of, and confidence in, the result. *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (citing *Lockhart v. Fretwell*, 506 U.S. 364, 370 (1993)). This is a high burden:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every

21

> effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689.

In this case, none of Petitioner's argued failures of his trial counsel satisfy the *Strickland* test. First, counsel's failure to introduce evidence about Meghna and Rasik does not meet the prejudice prong of the *Strickland* test. Their testimony, if as alleged, would have impeached Vijay by a specific contradiction. See OHIO EVID. R. 616(C). But it would not have called into question the testimony of Rupal, who effectively bolstered the credibility of Vijay's testimony. *Patel*, 2008 Ohio 4693, at ¶ 53. This in addition to the testimony of Chirag, Tarun, and Detective Scarl, among others, was more than sufficient evidence for a reasonable jury to convict Petitioner on all counts. When the state presented sufficient evidence for the conviction notwithstanding the testimony of a witness that trial counsel failed to impeach, there is no reasonable probability of a different result at trial, and therefore no prejudice. *See Glodjo v. Webb*, 382 F. App'x 429, 433 (6th Cir. 2010).

This argument by Petitioner is actually rather similar to that in *Glodjo*, where a habeas petitioner argued trial counsel was ineffective by not visiting the scene of the crime and impeaching witnesses with evidence he would have gathered at the scene. *Id.* The Sixth Circuit reasoned:

> [E]ven assuming that defense counsel had sufficiently impeached Benson's testimony[,] the State had still presented sufficient evidence to obtain the manslaughter conviction. . . . [W]e conclude that Glodjo's defense counsel's failure to visit the Spruce Lance residence[, and] the resulting failure to impeach Benson's and Sanders's testimony with evidence from that scene[,] did not prejudice Glodjo's defense in any meaningful way.

*Id.* Here, Petitioner argues trial counsel should have attempted to find and interview Meghna and

22

Rasik, then used the information obtained from them to impeach Vijay. As explained above, the state presented sufficient evidence to obtain the convictions notwithstanding Vijay's testimony. Therefore, Petitioner cannot show prejudice from this argument.

The same is true for counsel's failure to object to testimony about Petitioner's pre-arrest silence and request for an attorney upon being questioned by the police, and also counsel's failure to object to hearsay and opinion testimony by Detective Scarl. There is not a reasonable probability that Petitioner would have been acquitted but for this evidence being admitted, in light of the mountain of other evidence presented. Without Scarl's testimony, and without testimony about Petitioner's silence and request for an attorney, there would still have been the testimony of Vijay, Rupal, Tarun, Chirag, and Dr. Sterbenz, all of whom provided evidence consistent with Petitioner murdering his wife in the manner charged. *See Patel*, 2008 Ohio 4693, at ¶¶ 45–55. Considering all of this evidence, the Court cannot find any remote chance, let alone a reasonable probability, that the outcome of the proceedings would have been different but for these alleged errors by Petitioner's trial counsel.

Second, Petitioner cannot meet the performance prong of the *Strickland* test with respect to counsel's failure to request certain jury instructions. At least when it comes to an instruction about Petitioner's past domestic violence incidents, Petitioner cannot overcome the presumption that this "failure" was a strategic trial decision, soundly within the realm of reasonable professional assistance. *See Strickland*, 466 U.S. at 689 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy" (internal quotation and citation omitted)). A reasonable and proficient defense attorney may strategically decide to forego requesting such an instruction because the instruction itself would remind jurors

23

about incidents that reflect poorly on the client.

Similarly, in regards to counsel's failure to request a jury instruction about the jury's right to consider the absence of motive as a circumstance that may be considered in weighing the evidence of guilt, a review of Ohio law shows this would have been a futile request. The Ohio Supreme Court has explained that such an instruction need not be given in cases like this:

> [I]n a murder case, where the evidence is circumstantial, the identification of the killer is not shown by direct evidence, and, therefore, his identification must be proved, motive or lack thereof becomes an important question, and in such cases the trial court has a duty to instruct the jury that it should take the evidence on that question into consideration, together with all the other evidence and circumstances, in determining the guilt or innocence of the accused. However, where there is direct evidence of a deliberate killing without provocation, and the determination of the guilt or innocence of the accused depends upon the credibility of witnesses to the act of killing, the question of motive need not be submitted to the jury.

*State v. Lancaster*, 167 Ohio St. 391, 398 (1958) (citations omitted). In this case, there was ample direct evidence of a deliberate killing perpetrated by Petitioner without provocation, as recited in the Court of Appeals' decision. For example, Vijay testified he observed Chetan strangling Sejal with a rope around her neck while her head was in his lap. *State v. Patel*, 2008 Ohio 4693, ¶ 51 (Ohio Ct. App. 2008). No testimony was offered about any alleged provocation by Sejal. Thus, Petitioner effectively argues that counsel was ineffective for failing to request a jury instruction he was not entitled to. Counsel's failure to make such a fruitless request for a jury instruction does not amount to ineffective assistance of counsel. *See Hill v. Mitchell*, 400 F.3d 308, 323 (6th Cir. 2005) (finding such a conclusion by the Ohio Supreme Court to be neither contrary to, nor an unreasonable application of, federal ineffective assistance of counsel law) (quoting *State v. Hill*, 73 Ohio St. 3d 433, 443 (1995)).

Third, Petitioner cannot meet the performance prong with his argument that trial counsel

24

should have objected to several of the prosecutor's comments during closing arguments. Under Ohio law, a prosecutor is entitled to latitude in closing remarks, and may state opinions based on the evidence presented at trial. "Generally, the State may comment freely on 'what the evidence has shown and what reasonable inference may be drawn therefrom.'" *State v. Baker*, 2005 Ohio 45, ¶ 19 (Ohio Ct. App. 2005) (quoting *State v. Stephens*, 24 Ohio St. 2d 76, 82 (1970)). Both the prosecution and the defense have this wide latitude in summation. *Stephens*, 24 Ohio St. 2d at 82. Even calling a defendant a "liar" during a closing argument has been allowed when it was a reasonable inference drawn from the evidence presented. *Baker*, 2005 Ohio 45, at ¶ 20.

The objections Petitioner argues counsel should have made were to comments about Petitioner being a "wife abuser" and "adulterer", involved in "domestic violence", and entering the marriage for "money from Sejal's family". But even a cursory review of the testimony offered in this case shows these comments to be within the prosecutor's wide latitude afforded by Ohio law. Rupal testified that Petitioner had been having an affair with her after marrying Sejal; Chirag also testified to this. *Patel*, 2008 Ohio 4693, at ¶¶ 48, 53. The prosecutor was therefore entitled to opine in summation that Petitioner was an adulterer. Similarly, Tarun testified Petitioner frequently hit Sejal for no reason, and Officer Greg Feketik testified he went to Petitioner's home on two occasions because of allegations that Petitioner had slapped and struck Sejal. *Id.* at ¶¶ 37–38. This shows the prosecutor's statements about Petitioner being a "wife abuser" and involved in "domestic violence" were reasonable inferences drawn from the evidence presented. Following *Stephens*, he was free to tell them to the jury during summation, and any objection thereto would have been futile.

Finally, there was evidence presented to support the inference that Petitioner married Sejal for money from her family. Lata testified Petitioner married Sejal through an arranged marriage and

that Sejal's father loaned Petitioner a total of $226,000 after the marriage. *Id.* at ¶ 41. This enabled the prosecutor to draw the reasonable inference that Petitioner married Sejal for money from her family, and to opine as much during closing arguments. Once again, an objection to this would have been futile.

Because the prosecutor did not run afoul of the wide latitude given during closing arguments, Petitioner's trial counsel did not give ineffective assistance by failing to object to any of it. In fact, as the Court has explained, none of Petitioner's arguments that he had ineffective assistance of counsel at trial satisfy the *Strickland* test. Therefore, the Court of Appeals' decision affirming his convictions despite his arguments of ineffective assistance of counsel was neither contrary to, nor an unreasonable application of, federal law.

## CONCLUSION AND RECOMMENDATION

Following review of the record, arguments presented, and applicable law, the Court is convinced Petitioner is not entitled to habeas relief under AEDPA. Petitioner's first ground has not been exhausted because it was not fairly presented to the state Court of Appeals. Petitioner concedes his second ground lacks merit, and the Court agrees. Petitioner's third ground fails because he cannot satisfy the *Strickland* test. In sum, the Court finds no decision contrary to, or involving an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. The undersigned therefore recommends the Petition be denied and dismissed.

s/James R. Knepp, II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time

26

WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).